UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

7 MILE & KEYSTONE, LLC, a
Michigan Limited Liability Corporation,

      Plaintiff,

vs.                                    Case No. 11-12930

TRAVELERS CASUALTY INSURANCE         HON. AVERN COHN
COMPANY OF AMERICA, a Connecticut
Corporation,

      Defendant.

_____/

**MEMORANDUM AND ORDER DENYING**
**DEFENDANT'S MOTION FOR PROTECTIVE ORDER**
**RELATING TO PRIVILEGED REDACTED DOCUMENTS (Doc. 29)**

## I. INTRODUCTION

This is an insurance coverage dispute.  Plaintiff, 7 Mile & Keystone, LLC (plaintiff),

submitted an insurance claim to defendant, Travelers Casualty Insurance Company of

America (defendant), after plaintiff's property was destroyed in a fire.  After an investigation,

defendant denied the claim and accused the plaintiff of arson.  In discovery, the parties are

having difficulty agreeing on the nature and scope of the disclosure of certain emails.  Now

before the Court is defendant's motion for protective order relating to privileged redacted

emails (Doc. 29).  For the reasons that follow, the motion will be denied.

## II. BACKGROUND

On April 6, 2010, defendant issued plaintiff a commercial policy of insurance for the

property located at 5125-5135 East Seven Mile Road in Detroit.

On June 29, 2010, the property was completely destroyed by a fire.

On or about October 22, 2010, plaintiff submitted to defendant proof of claim number EFW5532 in the amount of $1,012,011.38.

Defendant initiated an investigation.  The investigation was headed by defendant's general adjuster, Joe Zack (Zack), who was in charge of making claim decisions.  As part of Zack's investigation, he communicated with Jim Thomas (Thomas), a fire cause and origin investigator, and Michelle Kloss (Kloss), defendant's special investigative unit investigator.  After the investigation commenced, defendant's lawyer became involved in the investigation and actively communicated through email with the investigators.

On May 17, 2011, defendant denied the claim.  In its denial letter, defendant stated,

> Our investigation has revealed that the fire was deliberately set and originated at numerous separate and unconnected points of origin.  After the fire, a strong odor of gasoline emitted from the property and at least ten hits of gasoline were discovered throughout the property. Our investigation has further revealed that you were the only one with keys to the property prior to the fire.  The Company's investigation has determined that the fire occurred as the result of arson and was set or procured to be set by you and/or persons acting in privity with you or with your knowledge and consent.
>
> Based upon your claim presentation, statements, Sworn Statement in Proof of Loss, Examinations Under Oaths, the documents and records submitted as part of your claim and our investigation, we have also determined that you have made material misrepresentations of fact, committed fraud and sworn falsely. . . .
>
> . . . .
>
> You also have made material misrepresentations by providing documents to us created after the fire which misrepresent your personal financial condition on the date of the loss and you have provided documents with inflated values that overstated your personal net worth, misrepresents the value of your assets and which falsely create the appearance that you had significant additional assets prior to the fire.

2

(Doc. 29-4, p. 1).

Plaintiff filed suit on July 7, 2011 (Doc. 1).  On May 10, 2012, plaintiff took Thomas's deposition.  During the deposition, Thomas referenced pre-suit investigative emails that were not disclosed to plaintiff.  Subsequently, defendant provided the emails to plaintiff; they were heavily redacted, with seventy-nine redactions.  Defendant claimed the emails were protected by the lawyer-client privilege and work-product doctrine.

The parties conferred to resolve their differences; they reached an impasse.  Twenty-one redactions remain.  The Court has reviewed each of the emails which contain redactions *in camera*.

### III. LEGAL STANDARD

The scope of discovery is generally broad, as set forth in the Federal Rules of Civil Procedure:

> (1) *Scope in General.*  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense– including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. . . .

Fed. R. Civ. P. 26(b)(1).  Nevertheless, district courts have discretion to "limit the scope of discovery where the information sought is overly broad or would be unduly burdensome to produce."  Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 305 (6th Cir. 2007).

Where good cause is shown, the district court can enter a protective order barring discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." Fed. R. Civ. P. 26(c)(1). "By its own terms, the rule contains a built-in limitation that protects from disclosure materials subject to an evidentiary privilege." 360 Const. Co., Inc. v. Atsalis Bros. Painting Co., 280 F.R.D. 347, 351 (E.D. Mich. 2012).

## IV. DISCUSSION

Defendant asks the Court for a protective order declaring the twenty-one redactions privileged under either the (1) lawyer-client privilege or (2) work-product doctrine.

### A. Lawyer-Client Privilege

The Supreme Court has long recognized that "[t]he attorney-client privilege is the oldest of privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961)). Federal Rule of Evidence 501 provides that "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Because this is a diversity case, Michigan law applies. In Michigan, "[t]he scope of the attorney-client privilege is narrow, attaching only to confidential communications by the client to his advisor that are made for the purpose of obtaining legal advice." Leibel v. Gen. Motors Corp., 250 Mich. App. 229, 236 (2002) (citing Reed Dairy Farm v. Consumers Power Co., 227 Mich. App. 614, 618-19 (1998)). "The purpose of the attorney-client privilege is to permit a client to confide in the client's counselor, knowing that the communications are safe from disclosure." Co-Jo, Inc. v. Strand, 226 Mich. App. 108 (1997), superceded by statute on other grounds, (citations omitted). Where a lawyer acts

4

as a business advisor, his communications with a client are not privileged.  See Ypsilanti Cmty. Utils. Auth. v. Meadwestvaco Air Sys. LLC, No. 07-CV-1528, 2010 WL 200836, at *1 (E.D. Mich. Jan. 15, 2010) (citing Fox v. Massey-Ferguson, Inc., 172 F.R.D. 653, 669 (E.D. Mich. 1995)).

In the context of an insurance claim, "[c]ommunications by attorneys acting as insurance claims investigators, rather than as attorneys, are not protected by the attorney client privilege." Flagstar Bank v. Fed. Ins. Co., No. 05-CV-70950-DT, 2006 WL 6651780, at *4 (E.D. Mich. Aug. 21, 2006) (citing Mich. First Credit Union v. Cumis Ins. Soc'y Co., No. 05-74423, 2006 WL 185018, at *2 (E.D. Mich. July 5, 2006)).  This is so regardless of whether the claims handling work is done by in-house claims handling personnel or by outside counsel.  See Flagstar Bank, 2006 WL 6651780, at *6.

### B. Work-Product Doctrine

The work-product doctrine is a procedural rule of federal law governed by Fed. R. Civ. P. 26 in a diversity case.  In re Professionals Direct Ins. Co., 578 F.3d 432, 438 (6th Cir. 2009) (citing In re Powerhouse Licensing, LLC, 441 F.3d 467, 472 (6th Cir. 2006)). "Rule 26(b)(3) protects (1) 'documents and tangible things'; (2) 'prepared in anticipation of litigation or for trial'; (3) 'by or for another party or its representative.'" Id. (citation omitted). "To determine whether a document has been prepared 'in anticipation of litigation,' and is thus protected work product, we ask two questions (1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable." Id. at 439 (citing United States v. Roxworthy, 457 F.3d 590, 594 (6th Cir. 2006)).  The work-product doctrine is broader than the lawyer-client privilege and is

5

designed to allow a lawyer to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] clients' interests." Hickman v. Taylor, 329 U.S. 495, 510 (1947).

### C. The Disputed Emails

Having reviewed the emails containing the redactions *in camera*, the Court finds that they fall into two categories: (1) pre-suit emails between defendant's lawyer and defendant's investigators prior to defendant's denial of plaintiff's claim and (2) pre-suit emails  post-denial of plaintiff's claim (a) between defendant's lawyer and defendant's investigators and (b) between defendant's investigators not involving defendant's lawyer.

### 1. Pre-denial Emails

The unredacted emails between defendant's lawyer and defendant's investigators prior to the denial of plaintiff's claim are not privileged.  These emails reveal that defendant's lawyer was acting in the capacity of an investigator, and not a lawyer. Defendant's lawyer clarifies in some of these emails that the information relayed is in furtherance of the investigation.  Defendant cannot simply delegate investigative work to a lawyer and claim it is protected by the lawyer-client privilege or work-product doctrine. Accordingly, the pre-denial emails must be disclosed to plaintiff.

Defendant says a protective order is necessary because this case is like Leibel.  In Leibel, the court of appeals considered whether to apply the lawyer-client privilege or work-product doctrine to a legal memo prepared for General Motors (GM) by its in-house lawyer regarding ongoing product liability litigation. 250 Mich. App. at 231.  Addressing the lawyer-client privilege, the court of appeals stated:

6

>The memorandum, drafted by Gary Toth, an attorney in GM's legal department, contains Toth's legal opinions and legal recommendations regarding GM's analysis and documentation about seatback designs. Specifically, Toth assesses problems GM confronted in *litigating* seatback lawsuits and makes suggestions regarding the information needed to support GM's *position in seatback litigation.* In his legal memorandum, Toth advises GM to obtain more information on seatback safety and recommends ways to overcome deficiencies in seatback design and performance testing. The Toth Memo further sets forth Toth's legal advice about potential liability regarding seatback safety and how GM may protect itself against potential lawsuits.

Id. at 238 (emphasis in original). Accordingly, the court of appeals concluded that "the Toth Memo represents precisely the kind of legal advice in-house counsel routinely provides to a corporate client," and, therefore was protected by the lawyer-client privilege. Id.

Here, as stated above, the communications are not the routine kind of legal advice a lawyer provides to a client. Rather, unlike Leibel, defendant's lawyer was acting as an investigator, not as a lawyer. The advice given by defendant's lawyer was that routinely provided by a claims investigator. The lawyer-client privilege, therefore, does not apply.

In addition, the emails here were not made in anticipation of litigation, and, therefore are not protected by the work-product doctrine. The emails were part of a normal investigation to decide whether to approve an insurance claim. This is an ordinary business purpose. Thus, the emails were made in anticipation of making a claim decision as opposed to preparation for litigation.

In a recent decision, the Court addressed the issues disputed here. See Barton Malow Co. v. Certain Underwriters at Lloyd's of London Subscribing to Policy No. 509/QF004706, No. 10-10681 (E.D. Mich. Oct. 3, 2012). In Barton Malow, Barton Malow Company (Barton Malow) sued Certain Underwriters at Lloyd's London (Underwriters)

claiming that Underwriters wrongfully denied them coverage. Id. at *1. Before the claim was filed, Underwriters obtained the law firm of McCollough, Campbell & Land, LLP (law firm). Id. Barton Malow sought to have three passages, communications between the law firm and Underwriters, declared non-privileged and not protected by the work product doctrine. Id. After reviewing the disputed passages, the Court reasoned that "it is clear that the passages communicate legal advice from Underwriter's counsel regarding the extent, if any, to which Barton Malow's claim was covered. They show counsel's legal opinions regarding the scope of potential liability." Id. at *2.

Unlike Barton Malow, the emails here are not the lawyer's opinion or legal advice regarding defendant's potential liability, if any. Rather, the emails were the "work of an attorney performing a function that was part of the regular course of [defendant's] insurance business." Id.

At oral argument, defendant's lawyer suggested that the timing at which point she was hired– five months after an investigation had commenced– proves that she was acting in the capacity of a lawyer rather than an investigator. Even though defendant's lawyer was hired after the investigation began, however, the emails reveal that she was just another claims investigator. She did nothing more than continue to investigate the claim.

### 2. Post-denial Emails

The post-denial emails are more of the same. Defendant's lawyer is not providing legal advice, nor were the emails created in anticipation of litigation. Rather, the emails were a continuance of the ongoing investigation. Similarly, the emails between defendant's investigators were part of the investigation, not made in anticipation of litigation.

Defendant says the emails were created in anticipation of litigation because plaintiff's

8

lawyer threatened suit on April 22, 2011, before the claim was denied.  In an email to defendant's lawyer, plaintiff's lawyer stated,

> Michelle
>
> Despite my numerous requests, we have not received a claims decision yet.  Is Travelers going to make a claims decision anytime in the foreseeable future, or will it be necessary for me to simply file suit?

(Doc. 29-7).  However, this email does not mean that every subsequent email was in anticipation of litigation.  All that this email shows is that plaintiff was pushing defendant to make a decision on the claim, whether it was to grant or deny the claim.

Like the pre-denial emails, the emails made after April 22, 2011, and after the claim was eventually denied, are investigatory in nature and are not lawyer-client communications or covered by the work-product doctrine.

## V. CONCLUSION

For the reasons stated above, defendant's motion for a protective order is DENIED.  The twenty-one disputed emails must be disclosed to plaintiff.  Attached to this Memorandum and Order as Exhibit A is a representative sample of the disputed emails.[1]

SO ORDERED.


Dated:  December 14, 2012                    S/Avern Cohn
                                                                UNITED STATES DISTRICT JUDGE


---

[1] This decision relates only to the disclosures.  Admissibility at trial is to be decided separately if the case gets to trial and plaintiff moves for admission of an email.

9

Case No. 11-12930 7 Mile & Keystone v. Travelers Casualty Insurance

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 14, 2012, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160

Exhibit A

| Author: Michelle M. Kloss | Title: ISO follow ups |
|---|---|
| Category: Note | Date: 12/1/2010 9:10:16 AM |
| Note: | |

From: Kloss,Michelle M
Sent: Wednesday, December 01, 2010 9:09 AM
To: 'Michele Chapnick'
Cc: Zach III,Joseph; Thomas,James
Subject: RE: Travelers - 7 Mile & Keystone, LLC - 32643 - Claim No. EFW5532;

Michele,

I called Justin Miles for the 5/1/10 loss and left him a message to call me. I received a message back that he will call me in an hour, as he does not have his file information in front of him.

I spoke with Tom Baker from United National Insurance Company for the 8/19/10 loss. Tom advised that his investigation is completed and he found nothing suspicious with this claim. Tom would not provide any additional information. I told him that I would fax him the Chapter 45 letter to obtain additional information. Tom said that he would not release any information unless we have a subpoena.

With regards to the third Chapter 45 letter for the fire loss of 6/29/10 for E. Jefferson that information is incorrect. The 6/29/10 fire is our claim for this loss. I have gone through all the ISO reports and I cannot find any fire losses for the 14200 E Jefferson Ave Detroit MI address. I ran ISO again just with the address, there is no fire claims for that address.

I called Farm Bureau Mutual Insurance Company for the 8/10/10 fire loss for Ihsan Abdulmasih and spoke with Dennis McQuade. Dennis advised that the fire has been investigated and the cause was determined to be electrical. Dennis stated that the cement slab in the back of the house was tilted causing water to seep into the basement into an electrical outlet causing an arc, which started the fire. They have paid $128,000.00 so far for the house repairs and they had $140,000.00 contents loss as well.

ISO report is attached for the Jefferson Ave address.

When I hear back from Justin Miles, I will update you on what he has to tell me.

Michelle M. Kloss
Travelers Investigative Services
Cleveland Ohio
Cell 440-263-6085
Office 216-643-2190



From: Michele Chapnick [mailto:MChapnick@gregorylaw.com]
Sent: Tuesday, November 30, 2010 2:57 PM
To: Kloss,Michelle M
Cc: Zach III,Joseph
Subject: Travelers - 7 Mile & Keystone, LLC - 32643 - Claim No. EFW5532;

Attached are the Chapter 45 letters for Michelle to send to the involved carriers. On the 10/08 loss, I left a lot of information blank for Michelle to fill in once she runs and ISO and gets the information. Call if you have any questions. Additionally, if you have fax or emails, I would send them that way to speed up the process.

Regards,
Michele A. Chapnick
Gregory and Meyer, P.C.
340 E. Big Beaver Rd., Ste 520
Troy, MI 48083

TRV Thomas 000272

Office 216-643-2190

rec'd message from Joe Zack that DAve Rowe is a C&O person for Liberty Mutual and he believes he conducted the investigation of the fire from 10/08 to call him to see if he was involved and if he can help us 248-867-7378.

| Author: James Thomas | Title: EUO Held |
|---|---|
| Category: Investigation | Date: 12/3/2010 1:58:09 PM |

Note:

12/2/2010:

EUO was conducted with insured by Travelers retained Attorney Michele Chapnick.

| Author: James Thomas | Title: December Update Re EUO |
|---|---|
| Category: Note | Date: 12/7/2010 3:57:24 PM |

Note:

12/7/2010:

Received the below copied email update from GA Joe Zach regarding the status of this investigation.

From: Zach III,Joseph
Sent: Tuesday, December 07, 2010 12:57 PM
To: Kloss,Michelle M; Young,Harry R; Thomas,James
Cc: 'mchapnick@gregorylaw.com'; Finn,Stacy E
Subject: 7 Mile & Keystone File# EFW5532

Michele,

I was on a conference call this morning with our attorney doing the EUO, Michele Chapnick, and the Travelers attorney for MCU Staci Finn. Michele would like you to do some additional ISO research on some names and other fires she discovered that the insured has an ownership connection. Please assist her. The insured is scheduled to be back to finish the EUO on 12/14.

Thanks,
JZ



Joseph Zach CPCU, AIC, MBA
General Adjuster
Commercial Lines Major Case Unit
The Travelers Companies
PO Box 663
Nesconset, NY 11767
631-979-3640 (office)
631-871-1414 (cell)
877-872-4765 (fax)
jzach@travelers.com

| Author: Michelle M. Kloss | Title: add'l ISO reports |
|---|---|
| Category: Note | Date: 12/8/2010 12:52:01 PM |

TRV Thomas 000274

Michele,

I spoke with Riggs Bedford from the Hartford Insurance Company regarding the 7/6/10 fire loss at 12730 Fenkell in Detroit Michigan. Riggs was not in the office so he could not tell me everything he recalls from the claim. Riggs said that the fire was incendiary in nature as about 10 gallons of gas was used to burn the building. They have no proof at this time that the owner/insured is responsible for the fire. They are in the process of working out an ACV settlement with the public adjustor. Riggs referred me to their SIU investigator Skip Ward. Riggs said that the policy was not written properly but that was their mistake. Their insured is RMJ Venture with Ray Bacall listed as a partner. Riggs said that Skip has been investigating Ray for a while and should have some information for me. I called Skip and left him a message to call me back.

I called Aisha Galloway, Spencer's girlfriend, her number has been disconnected. I called Tracey, the cousin, and left a message to call me back. I called Spencer and left him a message to give me Aisha's new phone number and to tell both Aisha and Tracey to call me.

I did call Myran Bell and left him a message to call me too.

Michelle M. Kloss
Travelers Investigative Services
Cleveland Ohio
Cell 440-263-6085
Office 216-643-2190



From: Michele Chapnick [mailto:MChapnick@gregorylaw.com]
Sent: Wednesday, May 04, 2011 10:48 AM
To: Kloss,Michelle M
Cc: Magyar,Chris M; Zach III,Joseph; Finn,Stacy E
Subject: FW: EFW5532R 7 MILE

Michelle:

See below and attached. We knew about this fire but when you did the Chapter 45 before Hartford wouldn't give you any info. Looks like they denied it now. Chris happened to be in my office today so we were discussing. He said we could call NICB to find out what occurred with this claim. Please call him to discuss and follow up on this asap. Thanks!

Regards,
Michele A. Chapnick
Gregory and Meyer, P.C.
340 E. Big Beaver Rd., Ste 520
Troy, MI 48083
(248) 689-3920
(248) 689-4560 (fax)



| Author: Michelle M. Kloss | Title: tinnon, galloway statements |
|---|---|
| Category: Investigation | Date: 5/25/2011 3:44:29 PM |

Note:

From: Kloss,Michelle M
Sent: Wednesday, May 25, 2011 3:43 PM
To: Michele Chapnick; Zach III,Joseph; Thomas,James
Subject: 7 Mile and Keytone EFW5532

I obtained Tracey Tinnon and Aisha Galloway's recorded statements they have been sent to the file cabinet.



TRV Thomas 000326

Tracey Tinnon, 19162 Conley Detroit Michigan 48234, phone number 313-903-4910, date of birth 5/23/1976

Tracey reported that he heard an explosion around 2:30 or 3:00 AM. Tracey thought it was thunder as it had been raining that day so he did not get up to see what the loud noise had been. In the morning, Tracey thought it was Sunday morning, he got up and went out around 6:00 AM and walked towards the building and saw that the building was on fire. Tracey said that Spencer and he rent a house one street behind the building so he just walked up to the corner and saw fire trucks and policemen every where. Tracey said that the firefighters were putting out the fire and the police were there closing off the street. Tracey said that when he walked up the street came around the corner he saw that the building was on fire that was the first he knew about the fire. Tracey said that the building was on fire and smoke was pouring out, that the roof was on the floor.

Tracey said he called Spencer and told him that the building was on fire. Tracey said that he had to call Spencer to tell him about the fire, as Spencer was not at the house that night. Tracey said that Spencer is there on and off, that he lives with his baby mama that he stays at her house.

Tracey said that he has no idea who set the fire or why. Tracey said that Spencer did not set the fire. Tracey never met the new owner and he does not think that Spencer ever did. Tracey said no one was ever in the store regarding the purchase of the store or taking pictures of the store that he was aware of. Tracey worked there everyday from open to close and did not see any one or talk to any one regarding purchasing the store. Tracey said that the only person he talked to was on the day of the eviction the bailiff came in and told him they were being evicted and that they had to remove all of their property. Tracey said that Spencer handled all the business stuff with the building and business; he did not get involved with any of that or talk to any one regarding the business.

Tracey stated that he helped Spencer remove all the property from the building to the trailers outside, he was there the whole time they removed the property. Tracey said that they emptied everything out of the building and swept it clean that nothing had been left in the building. Tracey stated that there was no gas or gas cans left in the building everything had been removed. When the bailiff came to evict them, he changed the locks and they no longer had access to the building.

Tracey recalls that he saw the building was burning, smoking, water was being sprayed on the building, and he called Spencer and told him that the building was no more. After he spoke with Spencer, he left the area. Tracey thinks that Spencer came by some time that day to see what happened to the building.

Tracey said that on the last day of the move, which was Monday, he went by to check on the trailers that were parked across the street around 12:00, he walked back home and that was the last time he was by the building until Tuesday morning when the building was on fire.

Tracey said that Spencer never upset the bailiff and never threatened any one regarding the eviction that he heard and he was with Spencer throughout the move. Spencer took the eviction as it came he was not upset with anyone regarding the eviction.

Tracey stated that he had no idea they were going to be evicted as they were doing business the morning they were being evicted, as there were customers in the store that morning. Tracey said that he did not know anything about the finances regarding the business.

Aisha Galloway 12709 Virgil Street Detroit Michigan 48223, phone number 313-949-2758, date of birth 11/21/1976

Aisha reported that Spencer was with her that night as Spencer got a phone call from his cousin early that morning to tell him about the fire. After Spencer was done with the call, he told her about the fire. Aisha stated that Spencer was with her all night that they slept in the same bed and he did not leave that night. Spencer spent the night with her as he had a doctor's appointment that morning that she had to drive him to. Aisha said that she was just baffled as to what happened to the building. Spencer told her that the building caught fire and blew up. Aisha said she was in aw that happened, that she could not believe that had happened.

Aisha said that Spencer was not involved in the fire as she was with him all that night. They are boyfriend